| | |
|---|---|
| EULA H. SPURLING, *et al.*, ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | 3:01-cv-614 |
| ) | |
| THE FORESTLAND GROUP, LLC, *et al.*, ) | |
|     Defendants. ) | |

## MEMORANDUM OPINION

Plaintiffs have moved for the entry of partial summary judgment in this matter [Doc. 25]. Defendants have replied in opposition [Doc. 31] and have filed a cross-motion for summary judgment [Doc. 32]. Plaintiffs have filed a reply to their motion for partial summary judgment [Doc. 36] and a response in opposition to defendants' cross-motion for summary judgment [Doc. 37]. Defendants have submitted a reply [Doc. 45]. For the reasons that follow, defendants' cross-motion for summary judgment is **GRANTED** and plaintiffs' motion for partial summary judgment is **DENIED**.

## BACKGROUND

This is a case about a real estate agent, Eula Spurling (Spurling), who claims she worked for years to find a suitable buyer for a 36,000 acre tract of land in Morgan County, Tennessee. During August 1991, Spurling states she contacted Edgar Faust (Faust) at his office in Knoxville, Tennessee, to inquire if he was interested in selling the tract of land at issue, title to which was then vested in Emory River Land Company

(ERLC) and/or several members of the Faust family. On or about August 26, 1991, Spurling met with Faust, at which time he provided her with a topographic map of the property showing the boundaries and certain other documents regarding the property, including a booklet regarding ERLC and a timber cruise. She claims he gave her permission to show the property to prospective buyers.

At the August 26 meeting, Spurling asked Faust for a 5% commission if she should bring a buyer for the property. He informed her that she would be required to get any commission from the prospective buyer. Faust did not give Spurling an exclusive listing; however, she states he provided her a letter stating he would entertain any offer she might bring.[1] He also gave her the following instructions:

    a. do not give any information regarding the property to anyone in the state of Tennessee;

    b. look for prospective buyers outside the state and/or country;

    c. do not fax anything to his office unless he was there to receive it;

    d. do not put an exact price on the property; and

    e. tell prospective buyers the price would be negotiated but to expect to pay between $30 million and $35 million.

Faust also told Spurling that if anyone called him regarding a potential sale of the property, he would deny the property was on the market until Spurling identified the

---

[1] Spurling has submitted a letter from Faust dated August 27, 1991, which simply provides as follows:

> Emory River Land Company will consider an offer from your buyer on some 36,000 acres of land owned by Emory River Land Company in Morgan County, Tennessee.

2

prospective buyer to him either by phone or by letter. He further indicated that after she introduced the potential buyer to him, Spurling should step aside and he and the buyer would work out the terms, allow the attorneys and/or accountants for each side to take care of all the paperwork, and determine the date, place and time of closing.

In the summer of 1994, through LaVerne Matheson (Matheson), Spurling introduced Grable Ricks, Jr., R.E. Towns, and Tommy Thompson (Thompson) to Faust and to the property. After negotiations, an agreement was reached for a $30 million purchase price. Significantly, the terms of the agreement included a provision that the buyers were to pay the realtor a fee of 4% of the gross purchase price. However, the agreement was terminated when the buyers failed to meet the deposit requirements. Following the termination of the agreement, Spurling asserts Faust instructed her to continue showing the property. From August 27, 1991 to July 1, 1995, Spurling claims she took approximately 50 people (real estate agents and prospective buyers) onto the property.[2]

Following his failed transaction with Faust, Thompson suggested Matheson contact Tom Massengale (Massengale), President of The Forestland Group LLC (Forestland). Matheson and Spurling both spoke to Massengale and Spurling arranged

---

[2]She notes that she had traced the property boundaries from the topographic map Faust had given her onto several topographic maps to give to agents and prospective buyers. Spurling states it took five different quadrangles to get the entire property outlined.

3

a meeting with him in western North Carolina the last week of May or the first week of June 1995. She received a note from Massengale dated May 24, 1995, confirming the agreement to meet. Spurling and her husband, Jack, met with Massengale on May 30, 1995, at the Todd North Carolina General Store. During her visit, she delivered to Massengale a copy of the timber cruise on the ERLC property. She explained to him all of Faust's verbal instructions, which he acknowledged he understood. Spurling claims she asked him for a 4% commission on the gross purchase price, as it was her understanding from Matheson that he had already discussed with Massengale the 4% fee to be paid by Forestland in the event of the sale of the property.[3] According to Spurling, Massengale agreed that Forestland would pay a fee in the amount of 4% and told her he would have George Dutrow (Dutrow), a Vice President of Forestland, send a letter to that effect to Matheson.

Spurling asserts that because of the agreement, she later mailed to Massengale five maps on which she had traced the approximate boundary lines of the ERLC property. She also included a copy of the entire booklet about the property that Faust had given to her. She called Faust to inform him of Massengale's interest in the property, but learned he was out of town. She then called Massengale and requested

---

[3]Interestingly, on June 16, 1995, Matheson sent Massengale a letter questioning the June 9 Dutrow letter's reference to a "reasonable commission fee," noting that it was Matheson's understanding that Massengale "and Eula had already discussed the commission fees prior to this letter." Matheson requested that Massengale clarify the commission fee matter "in writing." Matheson also asked Massengale to sign an Agency Disclosure Document. In a June 27, 1995 telephone conversation, Massengale told Matheson that he was going to wait until he had further discussions with Faust before completing any documents.

4

that he write a letter of introduction to Faust and fax it to her. She suggested that Forestland mail a hard copy of the letter directly to Faust at his office. Spurling personally delivered a letter from Dutrow to Faust's office on June 16, 1995. However, after introducing Forestland to Faust, Spurling was told by Faust to not show the property to anyone else. On July 1, 1995, Faust told Spurling's husband that the property was not on the market. Spurling states that she followed up on the matter with several calls to Forestland. On July 6, 1995, Dutrow told Spurling that Faust had indicated to Forestland that he did not want to sell the property.[4] However, in 1998, Spurling learned that Forestland had finally obtained the property on November 12, 1997. When Spurling attempted to collect the agreed commission, she claims Forestland breached its agreement and refused to pay.

Defendants claim that plaintiffs are attempting to collect commissions on a real estate deal in which they played no role. Defendants assert their ultimate purchase of the subject property was consummated through an auction run by the New York investment firm Dillon Read & Company (Dillon Read).

By 1995 when he was approached by Matheson and Spurling, Massengale states he already knew of the property, having first learned of it and of Faust's possible interest in selling it sometime in 1993 from Thompson. According to Massengale, Spurling never gave him any confidential materials regarding the property and they

---

[4]According to Dutrow, Spurling called him on July 6, 1995 to advise him that Faust was "no longer interested" in selling the property.

made no agreement or arrangement as to a commission. Further, he claims that neither Spurling nor Matheson introduced him or anyone else connected with Forestland to Faust. He contends that Forestland did not undertake any investigation of the property or its possible purchase in 1995. After July 1995, Massengale notes he had no further communications with Spurling or Matheson.

According to defendants, in mid-1997, Forestland was contacted by Dillon Read, which was soliciting bids from several prospective buyers for the purchase of the property. After expressing an interest in bidding, Forestland acquired detailed information regarding the property from Dillon Read and decided to assemble a bid package for submission. Working through Dillon Read, Forestland was the successful bidder. According to defendants, none of the plaintiffs were involved in any way in the Dillon Read solicitation process, the bid assembly, or the decision to award the successful bid to Forestland. On August 13, 1997, a contract between ERLC and Forestland was executed for the purchase of the property, and the transaction closed on November 12, 1997.

Plaintiffs claim they are entitled to summary judgment as to the liability of Forestland to pay a commission, citing entitlement to judgment on at least two bases:

>  1. An oral contract between Spurling and Forestland, later substantiated by clear and cogent evidence, in which Forestland agreed to pay a commission in the event Forestland purchased the property; or
>
>  2. A written agreement, signed by an officer of Forestland, in which Forestland agreed to pay a commission in the event Forestland purchased the property.

6

**SUMMARY JUDGMENT STANDARD**

A party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Matsushita Electric Industries, Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

**ORAL COMMISSION AGREEMENT**

Oral contracts to pay commissions are valid, binding and enforceable in Tennessee. *Parks v. Morris*, 914 S.W.2d 545 (Tenn. App. 1995). "While oral contracts are enforceable, the person seeking to enforce them must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable." *Burton v. Warren Farmers Cooperative*, 129 S.W.3d 513, 521 (Tenn. App. 2002). An oral contract such as at issue here "must establish its essential terms by clear, cogent, and convincing evidence." *Parks*, 914 S.W.2d at 547. "[T]he mutual assent need not be manifested in writing; it may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." *Burton*, 129 S.W.3d at 529.

According to plaintiffs, the oral agreement in this case was simply to pay a commission in the event that Forestland purchased the property from Faust. Plaintiffs claim their actions in relation to trying to secure Forestland's purchase of the property,

7

along with their testimony, are sufficient to prove the existence of an oral contract to pay a commission. *See Apco Amusement Co., Inc. v. Wilkins Family Restaurants of America*, Inc., 673 S.W.2d 523, 527 (Tenn. App. 1984). Following the North Carolina meeting, plaintiffs note Spurling provided Massengale with information about the property, including maps and a detailed informational booklet. She called Massengale to request that he write a letter introducing his company to Faust. Further, plaintiffs assert the Dutrow letter confirms that Forestland had agreed to pay a reasonable commission once the land transaction was satisfactorily concluded. According to plaintiffs, all of these actions evidence mutual assent to the commission agreement between Forestland and plaintiffs.

Plaintiffs claim that since the sale was eventually consummated, the prerequisites for obtaining the commission have been satisfied, with Forestland liable to plaintiffs for the payment of the commission.

**WRITTEN CONTRACT**

In the June 9, 1995 letter from Dutrow, Forestland indicated, *inter alia,* as follows:

> The Forestland Group recognizes certain advantages of pursuing our interests in the tract through you and your associated realtors. We would anticipate paying a reasonable commission provided that the land transaction between The Forestland Group and the Faust family is satisfactorily concluded.

Defendants claim the letter states nothing more than Forestland's general willingness to continue preliminary communications with plaintiffs and does not make any firm offer or agreement. Plaintiffs, however, assert the letter from Dutrow constitutes a written offer

8

to pay a commission, which was accepted by Spurling when she engaged in actions leading toward a consummation of the property transaction. Thus, plaintiffs claim a binding contract for a commission was formed among the parties. According to plaintiffs, the elements of the written contract in this case are plain and ordinary:

1. Forestland agreed to pay a reasonable commission to plaintiffs if
2. The land transaction between Forestland and Faust was satisfactorily concluded.

Again, plaintiffs claim that since the sale was consummated, the prerequisites for obtaining the commission have been satisfied, with Forestland liable to plaintiffs for the payment of the commission.

Interestingly, after Spurling introduced Forestland to Faust, she was told by Faust to not show the property to anyone else and to stay off it. On July 1, Faust informed Spurling's husband that the property was not on the market. By July 6, 1995, the parties learned that Faust did not want to sell the property and, apparently, had rejected Forestland's interest in the tract. Therefore, negotiations ceased before plaintiff ever arranged for anyone from Forestland to speak with Faust, visit the property, complete an investigation, or make an offer to purchase. Forestland never finalized an offer or communicated an offer for the property to plaintiffs. Communications between plaintiffs and Forestland stopped more than two years before Forestland purchased the property through the auction process.

9

Defendants had no further communications regarding the property until mid-1997, when Forestland, along with numerous other potential purchasers, received the solicitation from Dillon Read.  It appears Faust had retained Dillon Read to be his sole authorized representative regarding the property and to solicit bids for the property. When Forestland expressed an interest in bidding, it received voluminous confidential material regarding the property from Dillon Read, on which it relied.  Forestland, working through Dillon Read, made the successful bid for the property and the transaction closed in November 1997.  Apparently, plaintiffs played no role in Forestland's ultimate purchase of the property two and one-half years later.

From the evidence of record, the court would be inclined to find that Forestland agreed to provide plaintiffs an appropriate commission **IF** the property transaction with Faust was successfully concluded.  The Dutrow letter did not address whether plaintiffs had to be the "procuring cause" of the transaction in order to receive the commission because, at that time, plaintiffs were already working to consummate the sale of the property.  Yet, while the claim of a broker may not be defeated by removing the broker and completing negotiations without him, *see Peavy v. Walker*, 39 Tenn.  App.  382, 284 S.W.2d 1, 4 (1954), a broker does not have a "perpetually vested interest in any transaction taking place between the customer and the principal." *Pacesetter Properties, Inc.  v.  Hardaway*, 635 S.W.2d 382, 389 (Tenn.  App.  1981).  It appears in this case that the latter negotiations between Faust and Forestland "were instituted in good faith after a substantial delay following termination of [the initial] negotiations." *Id.* In June 1995, after Spurling attempted to introduce Forestland to Faust, he instructed

Spurling to bring him no more offers, to stay off the property and to not show it to anyone else. On July 1, 1995, Faust told Spurling's husband that the property was not on the market. On July 6, 1995, it became clear that Faust did not want to sell the property at that time. Plaintiffs admit that they never again contacted Forestland about the property. Thus, it appears the initial "negotiations" between Faust and Forestland never really "began," whereas the second round of negotiations involving Forestland dealing with Faust through Dillon Read were instituted in good faith after a substantial delay following the termination of the first negotiations. Clearly, the relationship of Forestland and Dillon Read that resulted in a successful transaction had absolutely no connection to the past relationship between plaintiffs and defendants. Plaintiffs were not the "proximate, efficient, and procuring cause" of the land transaction obtained by Dillon Read and they have not demonstrated the existence of any bad faith on the part of Forestland. Accordingly, the court finds there is no genuine issue of material fact regarding the commission issue; plaintiffs are plainly not entitled to a commission from these defendants under the facts of this case.[5]

Additionally, the court finds that plaintiffs are not entitled to recover on any unjust enrichment claim. To establish unjust enrichment, plaintiffs must show that their efforts resulted in Forestland's purchasing the property and being benefitted by plaintiffs' actions. Even if Tennessee courts recognize such a cause of action for services

---

[5] *See Newman v. Hill*, 29 Tenn. App. 388, 196 S.W.2d 1008, 1009 (1945) (in rejecting the broker's claim for a commission, the court held that "[t]his is not a case of the owner stepping in and secretly closing the deal with the agent's customer for the purpose of escaping liability for the commission").

11

performed by a real estate broker, no evidence has been presented that defendants have benefitted from the actions of plaintiffs. Accordingly, any such claims by plaintiffs fail. *See Pacesetter*, 635 S.W.2d at 391.

**ORDER TO FOLLOW.**

                                       **s/Thomas W. Phillips**
                              **UNITED STATES DISTRICT JUDGE**